# 14-3924-CR(L)

## 14-4339-cr(CON), 14-4581-cr(CON), 15-199-cr(CON)

IN THE

# United States Court of Appeals

### FOR THE SECOND CIRCUIT



UNITED STATES OF AMERICA,

*Appellee,*

*v.*

VANESSA BANDRICH, AKA SEALED DEFENDANT 2, FENG LI, AKA SEALED DEFENDANT 3, FENG LING LIU, SHURAN LIU, AKA SEALED DEFENDANT 4, AKA HARRY, RUI YANG, AKA SEALED DEFENDANT 6, AKA SUNNY YANG, AKA YANG, MS., WEN TING ZHENG, AKA SEALED DEFENDANT 7, SHU FENG XIA,

*Defendants,*

*and*

GUO QIN MIAO, AKA SEALED DEFENDANT 8, AKA LILLIAN, RUI YANG, AKA SEALED DEFENDANT 6, AKA SUNNY YANG, AKA YANG, MS, YUCHANG MIAO, AKA SEALED DEFENDANT 5,

*Defendants-Appellants.*

———————————————

*On Appeal from the United States District Court
for the Southern District of New York (New York City)*

## BRIEF FOR DEFENDANT-APPELLANT
## VANESSA BANDRICH, AKA SEALED DEFENDANT 2

THE LAW OFFICES OF
SEAN M. MAHER, PLLC
*Attorneys for Defendant-Appellant
Vanessa Bandrich, AKA
Sealed Defendant 2*
233 Broadway, Suite 801
New York, New York 10279
212-661-5333

# TABLE OF CONTENTS

TABLE OF CONTENTS       …………………………………………………i

TABLE OF AUTHORITIES   ……..……………………………………….iv

STATEMENT PURSUANT TO RULE 28(a)(4) …………………………..1

STATEMENT PURSUANT TO RULE 28(a)(6)   ………..……………….1

ISSUES PRESENTED   …………………………………………………2

STATEMENT OF FACTS   ………………………………………………..2

A.    A Young Lawyer's Journey to New York City       ………………2

B.    Welcome to the Firm       ………………………………………3

C.    How to Seek Asylum   ……………………………..…………….4

D.    Why Chinese Immigrants Come to Our Shores       …………………7

E.    While the Young Associate is Trying to Learn the Ropes . . .       ………………………………………………..7

F.    . . . the Family Firm Cheats Behind her Back   ………..…………….8

G.    The Promotion That Wasn't   ……………………….…..……………12

H.    A Storm Brews       …………………….…………….…………14

I.    Vanessa Bandrich: In Her Own Words       …………..……………15

J.    The Government Continues to Investigate   …………..……………17

      (1)    *Cooperating Witnesses*       …………..……………..…17

      (1)    *Seized Documents and Files*       …………..……………18

K.      The Tweeting Jurors       …………………..………...………………22

ARGUMENT    ……………………………………….………………36

POINT I

THE EVIDENCE AT TRIAL WAS INSUFFICIENT AS
A MATTER OF LAW TO SUPPORT A CONVICTION        …………...36

A.      The Standard of Review          ………..……………….....37

B.      The Elements the Government Needed to Prove        …………....38

C.      Bandrich Did Not Participate in the Charged Conspiracy     ……....40

POINT II

THE DISTRICT COURT ERRED BY REFUSING TO DISCHARGE
JUROR 6 FOR HAVING INAPPROPRIATE INTERACTIONS WITH
ANOTHER JUROR         …………………………………………………45

A.      The Standard of Review        ………..……………………….46

B.      The District Court Improperly Permitted Juror 6 to
        Remain on The Case After it Learned of Premature and
        Inappropriate Deliberations Which the Juror Failed to
        Report to the Court as Required        …………………………46

POINT III

THE DISTRICT COURT ERRED IN FAILING TO GRANT
RULE 33 RELIEF BASED UPON THE IMPROPER CONDUCT
OF JUROR 2         …………………………………..…………………51

A.      The Standard of Review        ………..……….……………...51

B.      A New Trial Should Have Been Granted by the District Court Based
        Upon the Failure of Juror 2 to Follow the Court's Instructions and the
        Bias Reflected in her Tweets        …………………………………51

C.      Juror 2's Misstatements During the April 9, 2014 Questioning by the
        District Court Required That a New Trial be Ordered Pursuant To
        Fed. R. Crim. P. 33                     …………………………………..53

D.      The District Court Erred in Not Granting a Factual Hearing to Inquire
        of Juror 2 Regarding her Misconduct        …………………………56

CONCLUSION          ……..…………………………………………………57

CERTIFICATION          ……..…………………………………………59

# <u>TABLE OF AUTHORITIES</u>

PAGE

CASES

*Glasser v. United States*,
    315 U.S. 60 (1942) …………………..…………………………..38

*Jackson v. Virginia*,
    443 U.S. 307 (1979) …………….…………………………37

*McDonough Pwr. Equip. v. Greenwood*,
    464 U.S. 548 (1984) ……………………………………………54

*Remmer v. United States*,
    347 U.S. 227 (1954) …………………….................................50

*United States v. Abrams*,
    137 F.3d 704 (2d Cir. 1998) …………………………………46, 47

*United States v. Carmona*,
    858 F.2d 66 (2d Cir. 1988) …………………………………..47

*United States v. Cassese*,
    428 F.3d 92 (2d Cir. 2005) ………………………………38

*United States v. Ceballos*,
    340 F.3d 115 (2d Cir. 2003) …………………………….…41

*United States v. Cox*,
    324 F.3d 77 (2d Cir. 2003) …………………………….…47

*United States v. Diaz*,
    176 F.3d 52 (2d Cir. 1999) …………………………….…..46

*United States v. D'Amato*,
    39 F.3d 1249 (2d Cir. 1994) ………………………………38, 44

*United States v. Diez*,
    736 F.2d 840 (2d Cir. 1984) …………………….……………...41

iv

*United States v. Friedman*,
300 F.3d 111 (2d Cir. 2002) …………………………..…41

*United States v. Glenn*,
312 F.3d 58 (2d Cir. 2002) …………………………….....38, 44

*United States v. Ianello*,
866 F.2d 540 (2d Cir. 1989) …………………………..…56

*United States v. Imran*,
964 F.2d, 1313 (2d Cir. 1992) …………………………....51

*United States v. Juror No. One*,
866 F.Supp.2d 442 (E.D. Pa 2011) …………………….....51, 53

*United States v. Martinez*,
54 F.3d 1040 (2d Cir. 1995) ……………………………....38, 44

*United States v. Moten*,
582 F.2d 654 (2d Cir. 1978) …………………………….56

*United States v. Mulheren*,
938 F.2d 364 (2d Cir. 1991) …………………………....44

*United States v. Nusraty*,
867 F.2d 759 (2d Cir. 1989) ………………………….....40

*United States v. Parse*,
2015 WL 3540434 (2d Cir. June 8,2015) ……………………55, 56

*United States v. Samaria*,
239 F.3d 228 (2d Cir. 2001) ………………………….…41

*United States v. Shaoul*,
41 F.3d 811 (2d Cir. 1990) ………………………...…..54

*United States v. Soto*,
47 F.3d 546 (2d Cir. 1995) …………………………….38

*United States v. Wong*,
78 F.3d73 (2d Cir. 1996)   …………………………………………...51


STATUTES & RULES

18 U.S.C. § 371   …………………………………………….…1

18 U.S.C. § 1546   …………………………………………….39

28 U.S.C. § 1291   ………………………………………….…1

F.R.A.P. 4(b)   …………………………………………..……..1

Fed. R. Crim. P. 29 …………………………………..……...37

## STATEMENT PURSUANT TO RULE 28(a)(4)

(i)  Jurisdiction was conferred in the United States District Court for the Southern District of New York by the filing of indictment 12 Cr. 934 (RA).

(ii)  Jurisdiction is conferred in this Court pursuant to 28 U.S.C. § 1291 and Rule 4(b) F.R.A.P.  This is an appeal from a judgment of the United States District Court for the Southern District of New York (Abrams, J.) dated December 1, 2014. A timely Notice of Appeal was filed.

(a)  This is an appeal from a final order disposing all issues between the parties.

## STATEMENT PURSUANT TO RULE 28(a)(6) F.R.A.P.

This is an appeal from a judgment of the United States District Court for the Southern District of New York (Abrams, J.) dated December 1, 2014 convicting Bandrich of violating one count of conspiracy to commit immigration fraud in violation of 18 U.S.C. § 371.  Bandrich was sentenced to a term of imprisonment of one year and one day and one year of supervised release.  No fine was imposed but Bandrich was ordered to pay the mandatory $100 assessment and a forfeiture amount of $4,225,000.  Bandrich made timely motions for acquittal under Rule 29 and for a new trial under Rule 33.  The trial court denied the motions.

Judgment was entered on December 1, 2014 and a timely notice of appeal was filed on December 8, 2014.

1

## ISSUES PRESENTED

I.  Whether the evidence at trial was insufficient as a matter of law to support a conviction?

II.  Whether the trial court erred by refusing to discharge Juror 6 for having inappropriate interactions with another juror?

II.  Whether the trial court erred in failing to grant a new trial pursuant to Fed. R. Crim. P. 33 based upon the improper conduct of Juror 2?

## STATEMENT OF FACTS

**A.    A Young Lawyer's Journey to New York City**

Vanessa Bandrich, the daughter of Cuban immigrants, worked her way through college and law school in Miami and hung out a shingle shortly after passing the bar exam.[1] Though she loved helping immigrants navigate the labyrinth of our nation's immigration law, her fledgling practice provided less than a modest income.[2]

Looking for a more stable immigration practice to join, Bandrich put out feelers with her friends and colleagues.  Through a mutual friend, Bandrich was introduced to Troy Moslemi, an immigration attorney from Miami who recently had joined an immigration firm in New York City.

---

[1] A 2371-2374. "A" refers to the Joint Appendix; "SA" refers to the Sealed Joint Appendix; "SPA" refers to the Special Appendix; and "GX" refers to government exhibits offered at trial.

[2] A 2374-2375.

Encouraged by the possibility of practicing in New York, Bandrich met with the head of Moslemi's firm, a woman named Feng Ling Liu, who offered Bandrich a job as an associate in her firm. Torn between leaving her home, extended family, and friends in Miami and building a sustainable career and livelihood, Bandrich accepted the offer and moved to New York in mid-2009.

## B.    Welcome to the Firm

As a young and relatively inexperienced associate, Bandrich spent months acclimating to the workload at the firm, which was named Moslemi and Associates. While the firm was named after Moslemi in 2009 when Moslemi began working there, the firm previously had been named the Feng Ling Liu Law Firm.[3] The firm had a high volume asylum and immigration court practice tailored for immigrants from the Mandarin-speaking Fujian Province of China.[4] New associates quickly were thrown into the mix, handling asylum cases that were docketed in immigration court.

The culture at the firm proved to be challenging for new associates. Feng Ling Liu and her husband, David Miao, ran the office and staffed the office mostly with their relatives. The Liu and Miao families ran the office and hired young, inexperienced lawyers, such as Bandrich. Feng Ling Liu served as the lead

---

[3] A 990; 1647; 1656-1657.
[4] A 1093-1084; 1086.

attorney of the firm and David Miao was the office manager.[5]  Initial client interviews always were handled within the family by David Miao, Feng Ling Liu's brother and sister, Harry Liu and Lucy Liu, or David Miao's sister, Lillian Miao.[6] Clients didn't meet with lawyers until after an initial meeting with a paralegal or support staff person.[7]  Harry Liu, Lillian Miao, and Lucy Liu also were responsible for preparing clients for appearances before asylum officers and immigration judges.[8]  At times, Feng Ling Liu's nephew, Andy, helped with initial client interviews or with preparing clients for interviews and testifying.[9]  Miao's sister, Ann, and Harry's wife, Yolanda Gao, and Harry's brother-in-law, Kevin Xia, worked as a paralegals.[10]

Almost all communication within the firm between the Liu and Miao family members occurred in Mandarin,[11] even though Bandrich and other some associates did not speak the language.

Bandrich received some on-the-job training as she quickly was assigned immigration court cases.

**C.     How to Seek Asylum**

---

[5] A 884; 929-931; 1581; 1593; 1608.
[6] A 929; 1594-1295.
[7] A 929-931; 1124-1127.
[8] A 1641.
[9] A 929; 1641.
[10] A 1660.
[11] *See* A 1083.

To understand Bandrich's duties at the firm and how other members of the firm committed fraud, some background on the asylum process is helpful.[12]

An asylum seeker must first complete and submit a document called a Form I-589 detailing the reason the applicant is seeking asylum and the nature of the persecution the applicant faces upon return to her or his country of origin. Once that document has been reviewed by U.S. immigration officials, the asylum seeker is scheduled for an interview with an asylum officer. This interview is a non-adversarial interaction – most times the applicant appears without counsel. After the interview, the immigration official grants, denies, or defers asylum. If asylum is denied, then the applicant may petition the U.S. Immigration Court for relief.

To challenge an asylum officer's denial of asylum, an applicant typically retains counsel to file a petition with the U.S. Immigration Court. Upon receiving the petition, the immigration court dockets the case and places it on a "master calendar." Cases on the master calendar eventually are scheduled for an adversarial hearing before a U.S. immigration judge, who then can uphold the denial of asylum or decide to grant asylum. If the immigration judge upholds the denial of asylum, further appeals may be made.

---

[12] Ms. Ashley Caudill-Mirillo, a Deputy Director of the New York Asylum Office of the U.S. Citizenship and Immigration Services, testified about the asylum process . *See, e.g.,* A 530-535; 607-609; 624-625.

Throughout the asylum application process, every applicant signs multiple affidavits of truthfulness.[13]  Every Form I-589 contains a section, entitled Part D, in which the applicant must attest that all statements made in the application and all evidence submitted are all true and correct. Attorneys for applicants, asylum officers, and U.S. Immigration Court judges rely upon applicants' affidavits of truthfulness.  Everyone in the asylum field also relies upon translators, who are loosely regulated, [14] and relies upon the word of the applicant.[15]  Almost no independent investigation is ever done to corroborate an applicant's claim.[16]

While attorneys rarely appear at the asylum interview,[17] attorneys prepare clients for the interview, help clients to craft their personal statements, give advice on what relatives should write in support of the asylum application, and delegate certain duties to support staff, such as filling out paperwork and meeting with clients.[18]

If the Asylum Office suspects that someone is submitting a fraudulent asylum application, then the office places a "fraud hold" on the application, effectively freezing the application process until it is determined whether there is fraud or not.  If fraud is found, the application is terminated.

---

[13] A 575.
[14] A 583-586.
[15] A 695-696; 715-718.
[16] A 696.
[17] A 610.
[18] A 621-622;  698; 702.

### D.    Why Chinese Immigrants Come to Our Shores

The Moslemi firm assisted Mandarin-speaking Chinese clients in filing asylum applications and in appealing denials of asylum to the U.S. Immigration Court.  Thousands of Chinese citizens seek asylum in our country every year because the Chinese government routinely persecutes its citizens.[19]   The U.S. State Department has written annual reports detailing the persecution inflicted by the Chinese government upon its citizens. [20]   In particular, the Chinese government persecutes Christians, members of Falun Gong, and those who fail to follow the government's family planning policies.[21]

Because the Chinese government persecutes its citizens in a systematic manner, Chinese citizens arrested for illegal entry at the U.S. border often have the same stories of persecution before they ever meet an American lawyer.[22] Thousands of Chinese citizens are granted asylum in the U.S. based upon their past persecution or legitimate fear of future persecution.[23]

### E.    While the Young Associate is Trying to Learn the Ropes . . .

Bandrich learned that, in the highly compartmentalized firm, her role as a young associate primarily was to represent clients in immigration court to

---

[19] *See* A 528-529.
[20] A 630; 704-711.
[21] A 528-529.
[22] A 690-691.
[23] A 527.

challenge the denial of the client's asylum application. She, along with other non-Mandarin speaking associates, were not responsible for meeting new clients, negotiating client fees, conducting initial client interviews, signing asylum applications, preparing clients for interviews with asylum officers, participating in asylum interviews, or preparing office intake forms and information sheets.

Before Bandrich ever met a client, one of the Lius or Miaos already had met, interviewed, and documented the client's story of how the client feared persecution in China. A paralegal reduced the client's narrative into writing and memorialized it in a statement, which was attached to the client's I-589 asylum application. As required by U.S. immigration officials, every client attested that his or her statement was truthful and accurate and never told the lawyers "I am lying."[24]

## F.      . . . the Family Firm cheats behind her back

While Bandrich thought that the firm conducted perhaps haphazard but legitimate legal services, members of the Liu and Miao families assisted clients in filing fraudulent asylum applications and hid their fraudulent activities from Bandrich and other employees of the firm. This pattern of activity appears to have occurred in the Liu firm and continued after the Liu firm transitioned into the

---

[24] A 944-955; 1121-1124; 1126-1128.

Moslemi firm.[25] Feng Ling Liu and her husband David Miao remained firmly in charge of the Moslemi firm, just as they had with the Liu firm.[26]

The fraud process worked as follows. A potential client first met with a member of the Liu or Miao family – David Miao, Feng Ling Liu typically, but also Harry Liu, Lillian Miao, Lucy Liu, or Andy.[27] During the initial meeting between a client and a Liu or Miao, the fee would be negotiated and the type of asylum claim to be pursued was discussed. The client and one of the Lius or Miaos would discuss possible hurdles to asylum, such as the "one-year issue," meaning that an asylum application needed to be filed within one year of entering the United States, or the three main types of persecution claims – Christianity, Falun Gong, and family planning. [28]

The "people who deal[t] with the client"[29] had discussions with the client on fraudulent methods to overcome the legal hurdles, such as pretending to be Christian, using forged or altered documents, or finding people to provide untruthful testimony or affidavits.[30] "Claims were fabricated based on what employees determined was most likely to be successful in light of the applicant's

---

[25] *See* A 992-993; 1656-1657.
[26] A 999.
[27] A 929-930.
[28] A 932.
[29] A 934.
[30] A 931-938; 940-942; 1610-1611.

background .[31]  For example, a claim of persecution based on Christianity, which would likely require familiarity with the finer points of the faith, might make most sense for an educated client, while a family planning claim might be better suited to a female client."[32]

The next step would be for the client to meet with certain paralegals who had been specially trained by Feng Ling Liu and her extended family members to craft a persuasive client persecution statement regardless of whether all the facts contained in the statement were truthful; frequently the statements were often based either on ready-made templates maintained by the firm or on previous narratives that had been crafted for the same type of claim.[33]  These paralegals were referred to as "story writers."[34]

The paralegals who helped write the statements also helped the clients with the drafting of attestation letters that needed to accompany the asylum application and sometimes provided stationary to make the letter look like it came from China.[35]

Once the asylum application was complete, the firm submitted it to the Asylum Office, which would then schedule an interview for the applicant with an

---

[31] A 935-936; 1361; 1610-1611; GX 40T at 21.

[32] A 3021 (Opinion of Judge Ronnie Abrams, Dec. 22, 2014)(citing A 936; 1361, 1610, 1631; GX 40T at 21-22).

[33] A 948-950; 1621.

[34] A 942; 1614.

[35] A 951; 962; 968.

asylum officer. A tight group of people prepared the clients, sometimes over multiple sessions, for the asylum interview: Harry Liu, Lillian Miao, Lucy Liu, and Victor You.[36] These members of the firm helped prepare the clients for the asylum interviews, many times by going over specific types of questions that the asylum officer might ask concerning, for example, Christianity.[37] Some applicants were coached by these employees to treat their asylum interviews as if they were "actor[s]" in "a movie."[38]

If the application was granted by the asylum office, then the work was complete. If the application was denied, a petition challenging the denial could be filed in immigration court.

Once the case made its way to immigration court, the firm's senior paralegals - Harry Liu, Lucy Liu, and Harry's wife Yolanda Gao. - would meet with the client to prepare the client for the hearing.[39] The final preparation sessions were led by the attorney who was assigned the case, such as Feng Ling Liu, Bebe Xue, Feng Li, or Bandrich.[40]

While certain members of the firm assisted clients in filing fraudulent claims, Bandrich remained in the dark. As an attorney, Bandrich had a duty to

---

[36] A 979-980.
[37] A 979-980; 1087-1088.
[38] GX 141T at 55, GX 112T at 19.
[39] A 990.
[40] A 990.

prepare her clients to testify at immigration court hearings and she did so similarly to any other litigator. Bandrich gave the clients instructions of what to do and what not to do in court, especially concerning demeanor, being respectful, and how to work with an interpreter while testifying.[41] Bandrich went over the client's anticipated testimony with the client and advised the client to be completely familiar with his or her written statement. Bandrich's clients, who generally were uneducated and unsophisticated, not surprisingly made mistakes when they prepared to testify. Bandrich never told the clients to lie or make something up.[42]

## G.  The Promotion that Wasn't

After over a year of carrying a high volume of immigration court cases, Bandrich was informed that Liu wanted to start a new firm and wanted to offer the title of the new firm to Bandrich. Liu would staff the office with Mandarin-speaking paralegals and support staff to handle initial phases of cases, while Bandrich would handle the cases filed in immigration court. Unlike at the Moslemi firm, Bandrich would review asylum applications after they were prepared by paralegals. The new office was to be run by the office manager, Harry Liu.

Thinking this was a good career move, in 2010 Bandrich accepted and joined the new firm, which was called Bandrich & Associates. Bandrich continued

---

[41]  A 993.
[42] *See* A 999.

with basically the same duties as when she was an associate at the Moslemi firm.

Harry handled the intake of new clients, Mandarin-speaking paralegals, along with

Harry, prepared client statement's to be included in asylum applications, made sure

the statements were translated into English, and prepared the clients for the asylum

interviews.  After the paralegals had prepared the asylum applications, Bandrich

reviewed the applications to make sure everything was legally compliant.  Upon

finding so, Bandrich signed off on the application.

Though she never told Bandrich, Feng Ling Liu wanted to create the new

firm not as a promotion for Bandrich, but rather because Liu was concerned that

the high volume of applications filed by her firm might attract unwarranted

scrutiny from federal authorities. [43]  Feng Ling Liu tasked her brother, Harry Liu,

with opening and running a new firm across the street, hoping that the creation of a

separate firm—with a separate name—might draw less attention to the

conspiracy's activities.[44]  Bandrich was chosen as the face of the new firm where

she was also the sole attorney. [45]  Just like at the Moslemi firm, the Liu and Miao

families kept tight control over the running of the Bandrich firm and engaged in

---

[43] A 995-996; 1657.

[44]  A 995-996; 1656-1657.

[45] A 995.

similar fraudulent acts. [46]  Harry ran the new firm so tightly that employees considered Bandrich &Associates to be "Harry's firm."

## H.    A Storm Brews

Although Bandrich appreciated having a steady job in the field of her choice, she was concerned about the competence of some of her co-workers and the stress of managing a high volume practice.  Shortly after the birth of her first child, Bandrich began thinking about moving back to Miami to be closer to family and to find a less stressful work environment.

By this time, federal authorities were investigating numerous law firms in Chinatown on suspicion that the firms were committing immigration fraud.  In particular, the government suspected attorneys and legal staff at the Moslemi firm were submitting fraudulent asylum applications to U.S. immigration officials in order to secure asylum for their ineligible immigrant clients. The government also suspected that the leadership of the Moslemi firm created the Bandrich firm to lower the criminal exposure of the Moslemi firm by spreading the fraudulent filings between two firms.

Through the use of a confidential informant, the government obtained incriminating recorded conversations of Victor You, a disgruntled former Moslemi firm associate who had been fired by Feng Ling Liu.  After meeting with FBI

---

[46] *See, e.g.,* GX 40, 44, 57, 110; A 968; GX 302A-K.

agents and federal prosecutors and learning that he faced potential incarceration followed by deportation, You agreed to become a cooperating witness and to try to develop evidence against the Moslemi firm.

As part of his duties as a cooperating witness, You was tasked to record conversations with his friend and Moslemi firm associate, Meng Fei Yu, in order to build a case against Yu. After capturing several conversations of Yu, the government approached Yu and presented her with the decision to either face prosecution and deportation or become a cooperating witness. Yu decided to become a cooperating witness.

## I.    Vanessa Bandrich:  In Her Own Words

As a cooperating witness, Yu invited her friend and former co-worker Bandrich to a series of lunch dates. [47]  During those lunches, Yu, at the behest of the government, recorded her conversations with Bandrich and tried numerous times to get Bandrich to make incriminating statements.[48]  While Bandrich did gossip about various people in the Moslemi and Bandrich firms, Bandrich never made any statement admitting her guilt in any criminal conspiracy.

In one exchange between Yu and Bandrich, Yu brought up how many of the cases were the same and that the clients had the same story.  Specifically,  Yu said,

---

[47] *See, e.g.,* A 1716; 1721.
[48] A 1761-1763; 1777-1778; 1780; 1789-1790; 1793; 1890; 1922; GX 127, 133, and 139.

"Even now, they don't get good new story. Different ones."[49] Yu then said that she felt awkward in Court because all of the stories were the same.[50] Bandrich, commiserated with Yu over what Bandrich thought was a discussion about how shoddy the practices were at the firm and recounted a story about how one of the employees was caught cutting and pasting a story and that she told them to stop.[51] Emphasizing her view of the paralegal's incompetence and management's tolerance of the incompetence, Bandrich stated "Harry is so stupid, so stupid."[52] Yu pressed on, saying, "They must know this," to which Bandrich replies, "Of course they know and they say yes to everything."[53] Bandrich ended the exchange by stating "Whatever, I need to get out."[54]

Yu testified further about what warnings she said she gave Bandrich about working at the job.

Q. Did you ever warn Vanessa Bandrich about the job?

A. Yes.

Q. What did you say?

A. I, I told her why I quit the job, basically, that's kind of worry, I'm worried about the safety of this job, fraud, everything, we made up mistake every day and I'm worried

---

[49] GX 127T at 16-17.
[50] GX 127T at 16-17.
[51] GX 127T at 16-17.
[52] *Id.*
[53] *Id.*
[54] *Id.*

about this job.  So when we talking, I, I said to her, maybe all, that's what I said.  I said because we don't, we didn't have choice, so we work there.  If we have a choice, we should leave there.  And I think she agreed with me.[55]

When repeatedly confronted about whether Bandrich actually admitted to committing any acts of fraud in the recorded conversations, Yu conceded that Bandrich was not talking about fraud,[56] but rather discussed normal non-criminal bad things that can happen in a case, such a sloppy paperwork and lack of preparation of colleague, that have nothing to do with fraud.[57]

## J.    The Government Continues to Investigate

### (1)    *Cooperating Witnesses*

The government used other cooperating witnesses to pretend to be asylum-seeking clients at the Moslemi and Bandrich firms.  For instance, a government cooperating witness named Huai Guo Wu retained the Bandrich firm to assist him in applying for asylum and video recorded his interaction with paralegal Rachel Yang, including her assisting him in writing an apparent untruthful persecution statement.[58]

Wu met Bandrich, but never observed Bandrich do anything improper.[59]

---

[55] A 2059.

[56] A 1779; 1789; 1791; 1797; 1874-1875; 1886; 1890; 1892; 1909-1910; 1921-1922.

[57] A 1902-1904; 1908.

[58] A 1244-1256.

[59] A 1268.

17

Wu conceded that he signed various attestations and affirmations that his asylum application was truthful and correct and that he waived having an attorney present at his asylum interview.  Mr. Wu also conceded that he has lied several times; he even lied about his current residence in his pending asylum application.[60]

Another government cooperating witness, Jin Xue, pretended to be a client seeking asylum assistance from the Bandrich firm in 2012 and surreptitiously recorded 11 interactions at the Bandrich firm.[61]  Xue talked with paralegal Rachel Yang about how to manufacture one year evidence,[62] about the need to use different kinds of paper for each of the three letters,[63] and about the need to conceal that he had been in the country for more than a year.[64]

Xue never recorded any interactions with Bandrich and never told Bandrich that he was submitting a fake claim.

### (2)    *Seized Documents and Files*

The government eventually obtained a search warrant to seize documents, files, computers, and other items from both the Moslemi and Bandrich firms.  FBI agents subsequently conducted searches and seized hundreds of clients' files, thousands of documents, and numerous computers.  On the same date, the FBI

---

[60] A 1273-1280; 1285; 1323-1325.
[61] A 2087-2089; 2285.
[62] GX 112T at 26-27.
[63] GX 112T at 37.
[64] GX 112T at 38.

arrested Bandrich, Feng Li Liu, David Miao, and several other members of the Moslemi and Bandrich firms. The government did not charge Troy Moslemi and other non-Mandarin speaking attorneys who had worked at the Moslemi firm.

One set of documents recovered in the paralegal area of the Bandrich firm was typed client narratives with what appeared to be handwritten edits.[65] Meng Fei Yu testified that she believed the handwritten notes were from Bandrich.[66] According to Yu, none of the documents seized from the Moslemi firm contained Bandrich's signature or handwriting.[67]

In one document seized from the Bandrich firm, a sentence that said "If he returned to China, he would be sentenced because the police are now still looking for him," appeared marked for editing with the following passage:

> My husband was detained in China for about one month during which time he was seriously mistreated. He now known by the Chinese government to be a Falun Gong follower, which is regarded as an evil cult organization in China. Also, he is require to report to the police station in China and therefore police began looking for him ever since he failed to appear for his reporting appointments. [68]

Affixed to the document was a post-it note stating "I already typed Vanessa's handwritten revisions."[69]

---

[65] GX 401-409.
[66] A 1649.
[67] A 1929.
[68] GX 416.
[69] *Id.*

Agents also found yellow notepad pages with what appears to be handwritten drafts of three letters.[70] These letters had blanks for where names should be written. According to You and Yu, when they worked at the Moslemi firm, they left names blank when writing fake attestation letters because they did not know who the client would pick to write them.[71]

None of the documents with handwriting were recovered from Bandrich's personal office, which was identified as "Office B."[72] Agents found no evidence of any crime in Office B; there were no fraudulent files, no financial documents, and no valuable items in Office B.[73] Special Agent Kibler, who oversaw the seizure of the documents, could not say who wrote or generated any of the documents.[74]

Of those files containing what Yu believed to be the handwriting of Bandrich, not one file was shown to contain any false statements or material misrepresentations.[75]

Another set of documents was characterized as "coaching" documents by the government. These documents were in Mandarin and were not found in Bandrich's personal office. Yu identified these documents found at the Bandrich

---

[70] GX 400, 401, 402.
[71] A 955-956; 1626-1627; *see* GX 677.
[72] A 1562-1564.
[73] A 1564; 1568-1569.
[74] A 1501.
[75] A 1932-1935.

firm[76] as the exact same training materials that they used at the Liu Firm when she was employed there.[77]  There was no testimony that Bandrich ever distributed the documents to anyone.

You believed that of the hundreds of asylum applications he worked on at the Moslemi firm, approximately 20 were legitimate.[78]

In contrast, Ms. Caudillo-Mirillo, a Deputy Director of the New York Asylum Office of the U.S. Citizenship and Immigration Services, testified that her office keeps track of all asylum cases filed with her field office and that her office keeps records of who appears before asylum officers and immigration judges.  Of the over 400 cases from Bandrich & Associates from 2010-2012, none to her knowledge were fraudulent.[79]

Ms. Caudillo-Mirillo confirmed that except for asylum seeker Lin Chen, who was not represented by Bandrich, no other cases were put on a fraud hold and that not one asylum claim from Bandrich & Associates has been terminated because of fraud.[80]

---

[76] GX 407, 408, 410.

[77] A 1655-1656.

[78] A 903.

[79] A 606.

[80] A 606.

Ms. Caudillo-Mirillo confirmed that she had never met Bandrich and that Bandrich was never at an asylum interview and was never involved in any fraud at an asylum hearing.[81]

## K.    The Tweeting Jurors

On March 19, 2014, the jury trial of defendants Liu, Bandrich, and Yang commenced with jury selection.[82]  On March 20, 2014, a jury of twelve with four alternates was seated and the Court gave the sworn jurors preliminary instructions which included a cautionary statement regarding their conduct as jurors.[83]  The Court stated as follows:

> Now, a few words about your conduct as jurors.  First, **during the trial you are not to discuss the case with anyone**, nor are you to permit anyone to discuss it with you.  Until you retire to the jury room at the end of the case to deliberate, you're simply not to talk about the case.  **Do not even discuss the case with each other until your actual deliberations begin at the end of the trial**. …
>
> Second, **if anyone should try to talk to you about the case, please bring it to the attention of Ms. Cavale, my courtroom deputy, and she'll bring it to my attention**. … Do not talk or read about the facts or circumstances of this case on social networking sites such as Facebook or MySpace.  **Don't tweet about your experience here on Twitter**, and don't try and find any information about this case or any similar case, whatsoever.
>
> Third, you're instructed not to read, listen to, or watch media reports on television, newspaper, radio or internet about the

---

[81] A 604.

[82]  A41.

[83]  A 446-447.

case, if there even is any. You must not be influenced by anything you might see or hear outside of the courtroom. If you inadvertently come across a news report relating to this case, immediately stop reading, listening or watching. You should then tell Ms. Cavale that, no one else, including your fellow jurors about that fact.

Fourth, do not do any research or investigation about the case, or anything touching upon the case. Again don't go on the internet, do any searches about the case, or these kinds of cases. I apologize for being repetitive. This is very important.[84]

A similar cautionary instruction was given by the District Court on at least twenty-nine occasions during the course of the three week trial.[85]

Following jury selection the trial was adjourned to March 24, 2014 for opening statements and the commencement of the government's case. During the ensuing three weeks, a total of twelve government witnesses and two defense witnesses testified. On April 8, 2014, the presentation of evidence concluded and the government gave their initial summation before the Court adjourned for the day.[86]

During the early morning hours of April 9, 2014, several of the attorneys for both the government and the defendants received an anonymous email which stated that Juror 10 had been tweeting about the trial. The author of the email stated that they had been doing "research on juror misconduct" when they came

---

[84] A 452-453 (emphasis added).
[85] SPA 55.
[86] A 2249-2456.

23

across a number of tweets from a sitting juror who they were able to determine was a juror in our case.[87]  The email was forwarded to the Court by defense counsel and the matter was addressed the morning of April 10, 2014.  It was determined that Juror 10 had been tweeting about the case since March 20, 2014 on almost a daily basis.  A review of the tweets included the following:

- Add in just one song & dance number, and this federal case would rival anything I've seen on #broadway #juryduty rocks

- But for my ADD, I'd want to be an ADA.  Thanks DAD

- Can't help wondering who would win if the #prosecutors played the #defense attorneys in #colorwar #juryduty

- #Courtside seats! #juryduty

- The first rule of #juryduty is you do not talk about #juryduty

- That awesomely awkward moment the lawyer's cell rings from his pocket during cross, and he tries to blame it on his paralegal. #juryduty

- Only commonality between the #prosecution and #defense seems to be the propensity for @RicolaUSA #Eventhejudgeissick #juryduty.[88]

- My jury duty BFF[89] is from Kentucky, a true rural juror[90]

---

[87] SPA 55.
[88] SPA 55-56.
[89] "BFF" is an abbreviation for "Best Friend Forever."
[90] A 2461-2462.

On the unanimous consent of all the parties and the approval of the Court, it was agreed that Juror 10 would be dismissed but that first an inquiry of her needed to be conducted to determine what, if any, inappropriate commentary was shared with her fellow jurors.[91] During the discussion with Juror 10, the Court provided one of the offending tweets to her and stated "I'm going to show you what we have marked as Court Exhibit 8, in which you indicate among other things that 'But for my ADD, I want to be an ADA,' which could potentially show some bias."[92] Under further questioning by the Court, Juror 10 stated affirmatively that she had "zero connection outside of that room" with any of her fellow jurors. [93]  The Court further inquired about the offending juror's tweet regarding her "BFF":

> THE COURT: So, we have one more question, and that is about your jury duty BFF from Kentucky.  Just to confirm that you have not spoken to her about –
>
> JUROR: I don't even know how to pronounce her last name.
>
> THE COURT: You have not spoken to her about the substance of the case?
>
> JUROR: Absolutely not.[94]

The Court concluded the inquiry by dismissing Juror 10.

---

[91] A 2459-2460.
[92] A 2472.
[93] A 2473.
[94] A 2476.

Following this inquiry, the Court and all the parties agreed that the remaining jurors should be interviewed individually by the District Court but in the presence of counsel to determine the extent of the damage caused by Juror 10's misconduct.[95]

During the inquiry of Juror 6, the offending jurors "new BFF", it was determined that Juror 10 had, in fact, engaged in inappropriate communication with Juror 6 during their daily train ride home together.

> THE COURT: In particular, have you communicated all with Juror 10, Ms. Greenfield?
>
> JUROR: I actually ride the train with her.
>
> THE COURT: You do?
>
> JUROR: Yeah.
>
> THE COURT: Have you talked to her at all about the case?
>
> JUROR: No. There has been a couple attempts, but no.
>
> THE COURT: Attempts, tell me about that. What does that mean?
>
> JUROR: You know, like we have questions. We will have questions sometimes in here as well, where you just you know, ask a question. And I think as anything if somebody feels like it's too much of a questions, like close to being with the case, there is no answer.
>
> THE COURT: Ok. Can you think of any examples of what that may be?

_____

95 A 2478-2519 contains the *in camera* questioning and discussion.

JUROR: No.

THE COURT: Ok. Well, did you ever talk about your views of who is wining, or what's happening in the case, or any of the evidence.

JUROR: No, no.

THE COURT: Any of the witnesses, did you talk about any of the witnesses.

JUROR: No. The Only think I can think of was talking about do you think everybody is going to agree on the same thing , or everyone is going to agree with the same situation of something like that.

THE COURT: And do you remember what that was?

JUROR: No.

THE COURT: Ok. But was it in the jury room with all of the jurors?

JUROR: No. That was the train.

THE COURT: On the train. Just tell me whatever you can remember about that communication.

JUROR: Nothing offhand, because I'm pretty much – I have my own views in my head, so, you know, there is no letting on or out on those views.

THE COURT: You haven't shared your views. But do you remember did she say that to your? What was said and by whom?

JUROR: I think this was just like general questions, out of curiosity. But from my perspective if I felt something was too

27

close to a gray area of is this ok or not ok to talk about, then I just let it go.

THE COURT: Do you remember any of the general questions? I am not sure what a general question is.

JUROR: No.

THE COURT: Like about lunch, or how long you are going to sit on jury duty? Or about one of the lawyers, or the witnesses, or how the case is coming in? Was it sort of about the case or the parties –

JUROR: I think it would be more like – no. I think – I don't know how to say it. There is nothing that has been over the top, you know, or out of line.
THE COURT: Right.

JUROR: Does that make sense?

THE COURT: It makes sense. But even putting aside what you may think would be out of line, tell me anything you remember whether you think it was out of line or not, I mean not about your families but about jury service.

JUROR: I can't think of anything specific. I'm sorry.

THE COURT: That's OK. In you mind you say, well, nothing that went over the top. What are you kind of thinking? What is coming to mind when you think that that's why the conversation stopped?

JUROR: I don't know. I mean I don't answer conversation that are too much that I felt were leading to – because I don't think anything was out of the norm or in a bad, negative way. I think it was more a curiosity.

THE COURT: Right. But that's what I want to know. Even if it wasn't with a bad motive, it was just based on curiosity, I just

want to know what those conversations were, if they were about the case. I need to know that.

JUROR: It wouldn't be specific about the case; it would probably be more about the lawyers or, you know, the sides, or you know –

THE COURT: Like –

JUROR: -- do you think everybody is one sided, everybody is automatically going to be – has their mind made up? That kind of thing.

THE COURT: Ok. And do you remember if Ms. Greenfield asked you that question, or if you asked her that question? Do you remember who said what?

JUROR: I didn't ask any questions. You know, something like that maybe pertaining in that kind of situation.

THE COURT: And do you remember how you answered that?

JUROR: Like I don't know. Like I didn't answer in any yes/no. It was more of like an open-ended change the subject kind of a thing.

THE COURT: Ok. And just about that example, do you remember anything else about how she phrased it?

JUROR: No.

THE COURT: And when you say do you think everyone will agree on something, was it clear which way people might agree?

JUROR: Not really. We honestly have not – we don't discuss like whether it's in this room with everybody else. It's not the topic, you know.

THE COURT: I understand. And I know everyone is just trying to do the right thing. It's just my job to try and find out if people have talked about it at all.

JUROR: Sure.

THE COURT: Including just even about the lawyers, or styles, or me, or the witnesses or anything.

JUROR: Yeah.

THE COURT: So, if there is anything you can remember at all, any conversation at all that pertained to this case, even if it was cut off.

JUROR: Right. I'm sorry, nothing like offhand. As far as styles, if anything we talk about clothing or something, just to keep our minds elsewhere.

THE COURT: Right, Ok. Why don't you step out for a second.[96]

At this point, counsel for defendants requested that Juror 6 be excused For Cause. After a discussion with all counsel the Court continued to question Juror 6 who continued to give evasive and roundabout answers.[97] At one point, Juror 6 stated that all the jurors had occasions where they would be subjected to an inappropriate comment:

THE COURT: OK. Let me ask one more questions. So when we talked earlier about – I think you said something about, you know, you wouldn't answer when you felt like something was over the top. What does over the top mean? What did you mean by that?

---

[96] A 2485-2490.
[97] A 2496-2501.

JUROR: Ok, maybe not over the top, maybe in a fine gray area from my perspective. And it wouldn't just be Juror 10. You know, there are times where we are all having a good conversation, and something will get thrown out, and the room gets silent because it will just be disregarded like nobody will answer it.[98]

After a 20 minute inquiry, Juror 6 demonstrated a complete reversal of what she had been saying regarding inappropriate conversations on the train ride with Juror 10, and suddenly had a clear recollection of her discussions with the offending juror when she stated "[t]ruth be told, most of my conversations we have, like her and I ride the train, I would get off on the first train stop. So, we are on the same train, and it usually is about fitness, work out, kids."[99] At this point the District Court ended the inquiry.

Further inquiry into the rest of the jurors revealed that Juror 10 had engaged in misconduct with the entire jury panel as recounted by Juror 7:

THE COURT: So she [Juror 10] had an opinion in regards to what? Do you remember?

JUROR: Oh, Ok. She said we're all going to have the same opinion, right? And we all looked at her. Or some of us looked at her, and then we kind of just like ignored, her, and then we kind of just like ignored her, and they king of just shut her up, and that was it.[100]

---

[98] A 2498-2499.
[99] A 2501.
[100] A 2504.

31

Several of the jurors had a recollection of this event. At the end of the Court's inquiry of the remaining jurors, counsels for the defendants renewed the application to have Juror 6 removed from the case and one of the two prosecutors agreed.

> THE COURT: Do you [government prosecutor] object to releasing this juror?
>
> MR. EGAN: No.[101]

A second prosecutor, however, stated that she did not consent and the Court refused to release Juror 6.

During the inquiry of Juror 2, there were a series of questions and answers that would reveal themselves to be deceitful after it was learned, post-trial, that Juror 2 had also taken to tweeting about the trial during her jury service. At the April 9, 2014, questioning of Juror 2 in relation to the misconduct of Juror 10, she participated in the following colloquy:

> THE COURT: Have you spoken or communicated about this case in any way with any of the other jurors?
>
> JUROR: No.
>
> THE COURT: Either in person or on social media?
>
> JUROR: No.[102]

The Court further inquired about Juror 2's involvement in social media:

---

[101] A 2522.

[102] A 2480.

> THE COURT: Have you talked to anyone about the case, putting aside who she is?
>
> JUROR: No, aside from things like, oh, my God, I hope it's over tomorrow and things like that.
>
> THE COURT: Have you followed this at all on the Internet or on social media?
>
> JUROR: No.[103]

In fact, On April 6, 2013, three days prior to the Court's inquiry, Juror 2, tweeting under her maiden name Laura K. Curtis, communicated on twitter regarding her jury service, including the following exchange with a twitter follower:

> **Sara M. Anderson**: But you've got a lot of good research and plot bunnies, right?
>
> **Laura K. Curtis**: Oh, tons. And I am still trying to figure out how to ask the FBI guys, judge, and AUSAs if any of them will talk to my… Apr. 6th, 2014 Tweets[104]

Following the questioning of each individual juror and the dismissal of Juror Number 10, the Court gathered the jury together and further cautioned "[d]on't look on social media, don't Tweet about it."[105]

It was later revealed that Juror 2 was tweeting about the case with even more frequency than Juror 10. There were inappropriate comments throughout the trial:

---

[103] A 2480-2481.
[104] A 2840.
[105] A 2182.

33

- March 23rd, 2014, "Sitting on a jury for the next three weeks. May be interesting, but I don't really have three weeks to put my life on …"

- March 26th, 2014, "I suppose it's inappropriate to ask judges, prosecutors & witnesses to talk to your MSW chapter after the trial ends?"

- March 26th, 2014, "The bloody courtroom is FREEZING and the days are long because I have 2 hour commute on each end."

- March 26th, 2014, "Originally they said the trial would be three weeks. But I've seen the witness list now. And I am betting it goes longer."

- March 26th, 2014, "I am on painkillers, but it's starting to be a problem. My hands shake pretty badly at this point from the back and …

- March 26th, 2014, "Federal court jury is comfy chairs. The jury duty ones were not, but the ones in the actual jury box are."

- March 27th, 2104, "I suspect this trial will go at least three more weeks."

- March 27th, 2014, "It's interesting, but it makes a LONG FREAKING DAY."

- March 27th, 2014, in response to an inquiry about whether Juror Number 2 is "getting any book ideas while there?" the juror responds "Oh Plenty."

- March 31st, 2014, "One of my fellow jurors bought my book. It's a weird feeling knowing she is reading it and seeing her every day but not really KNOWING HER."[106]

---

[106] The juror who bought her book was dismissed juror number 10.

34

- March 31st, 2014, "it at all if she didn't like it. She told me when we were doing voice [sic] dire that she's a big crime fiction reader." The juror who purchased the book was dismissed Juror Number 10

- April 2nd, 2014, "Waiting for the trial to be over so I can have a realistic schedule again."

- April 2nd, 2014, "Whenever they're doing something new. It's really interesting. But it's incredibly repetitive."

- April 2nd, 2014, "No. and without saying anything a/b the actually proceedings, 3 separate defendants. So every witness gets questions a LOT."

- April 2nd, 2014, commenting on the Court and "she's the kind of person I would be interest in talking to."

- April 6th, 2014, "Oh, tons. And I am still trying to figure out how to ask the FBI guys, judge, and AUSAs if any of them will talk to my…"

- April 6th, 2014, "develop in the jury room is like a sociology study or something."

- April 12th, 2014, "I've spend the last 3 weeks on a jury and that's how I feel. :x"

- April 14th, 2014, "Okay, for all my tweeps who've been waiting to find out about the jury I've been on forever, this was the case: fbi.gov/newyork/press[107]

On the day of the verdict, Juror Number 2 tweeted an FBI bulletin about the case.

---

[107] A 2840-2842.

The offending tweets were not discovered before the end of the trial and were the subject of a joint post-trial motion for a new trial, which was denied by the Court.[108]

## ARGUMENT

## POINT I

## THE EVIDENCE AT TRIAL WAS INSUFFICIENT AS A MATTER OF LAW TO SUPPORT A CONVICTION

Vanessa Bandrich, an inexperienced young attorney from Miami, joined the Moslemi firm to build a career in immigration law because, as the daughter of immigrants who fled persecution in Cuba, she wanted to help others achieve what her family has been able achieve in our country.  The Liu and Miao family members who ran the Liu, Moslemi, and Bandrich firms hid their fraudulent practices from Bandrich and other non-Mandarin speaking employees of the firms in order to insulate their conspiracy.  The evidence at trial is consistent with this truth and was insufficient as a matter of law to support a conviction against Bandrich.

How was the evidence insufficient?

- Not one witness testified that Bandrich agreed to join the conspiracy.

- Not one witness testified that Bandrich committed a fraudulent act.

---

[108] A 2836-2863; SPA 53.

- Not one witness testified that Bandrich agreed to assist anyone in committing fraud.

- Not one document showed that Bandrich committed fraud.

- Not one document showed that Bandrich agreed to be a part of the conspiracy.

- Not one witness testified that Bandrich knowingly filed a fraudulent document.

- Not one email, text, or phone call indicated that Bandrich was a part of the conspiracy.

- Not one recorded statement of Bandrich indicated that she actually was a part of the conspiracy.

## A.     The Standard of Review

At the close of the government's case-in-chief, Bandrich raised a Rule 29 motion and requested that the trial court enter an order of acquittal. The trial court denied the motion.

To prevail on a motion for a judgment of acquittal under Rule 29, a defendant must show "the evidence is insufficient to sustain the conviction."[109] The test is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[110] Further, where a fact to be proved is

_____

[109] Fed. R. Crim. P. 29.
[110] *Jackson* v. *Virginia,* 443 U.S. 307, 319 (1979).

also an element of the offense, "it is not enough that the inferences in the government's favor are permissible;" rather, the inferences must be sufficiently supported to permit a rational juror to find "that the element, like all elements, is established beyond a reasonable doubt."[111] Thus, "if the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt."[112]

When assessing the sufficiency of the evidence of a criminal conviction on direct review, "[t]he verdict of [the] jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it."[113]

Although the standard of review for an insufficiency of the evidence claim is difficult to overcome, it is not insurmountable.

### B.    The Elements the Government Needed to Prove

To sustain a conviction, the government needed to prove that Bandrich knowingly conspired with others to commit immigration fraud in violation of 18 U.S.C. § 1546 by obtaining documents authorizing immigrants to stay in the

---

[111] *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995) (citing *United States v. Soto*, 47 F.3d 546, 549 (2d Cir. 1995); *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994)).

[112] *United States v. Cassese*, 428 F.3d 92, 99 (2d Cir. 2005) (quoting *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002)).

[113] *Glasser v. United States*, 315 U.S. 60, 80 680 (1942).

United States knowing those documents were procured by means of a false claim or statement, or to have been otherwise procured by fraud or unlawfully obtained. Section 1546 provides, in relevant part:

> Whoever . . . possesses, obtains, accepts, or receives any [immigrant or nonimmigrant] visa, permit, border crossing card, alien registration receipt card, or other document prescribed by statute or regulation for entry into or as evidence of authorized stay or employment in the United States, knowing it to . . . have been procured by means of any false claim or statement, or to have been otherwise procured by fraud or unlawfully obtained . . . [shall be guilty of immigration fraud.]

To sustain its burden of proof that the conspiracy charged in the indictment existed and had immigration fraud as its object, the Government needed to prove beyond a reasonable doubt the following elements:

First, that Bandrich and at least one other person entered into an agreement to obtain a document, as alleged in the indictment;

Second, that the document that Bandrich and at least one other person entered into an agreement to obtain was a document prescribed by statute or regulation as evidence of authorized stay or employment in the United States; and

Third, that at the time the agreement was entered, that Bandrich knew that the Form I-94, which is provided to an individual who has been granted political asylum by the United States Bureau of Citizenship and Immigration Services, was to be procured by means of a false claim or statement, or to have been otherwise procured by fraud or unlawfully obtained.

Besides proving beyond a reasonable doubt that the conspiracy charged in the indictment existed, and that the conspiracy had as its object the illegal purpose charged in the indictment, the government also needed to prove that Bandrich participated in the conspiracy with knowledge of its unlawful objective and with the intention of furthering the objective of that conspiracy.

In addition, the government needed to prove beyond a reasonable doubt that Bandrich unlawfully, knowingly, and intentionally entered into the conspiracy with a criminal intent—that is, with a purpose to violate the law—and that Bandrich agreed to take part in the conspiracy to promote and cooperate in its unlawful objective or objectives.

### C.     Bandrich Did Not Participate in the Charged Conspiracy

The government failed to marshal sufficient evidence to prove that Bandrich knowingly conspired to commit immigration fraud.  Bandrich did her best to represent clients who spoke a completely foreign language.  Bandrich relied upon her Mandarin-speaking co-workers to accurately translate, interpret, and convey information back and forth between her and her clients.

"Suspicious circumstances . . .  are not enough to sustain a conviction for conspiracy."[114]  The government must provide evidence of the defendant's

---

[114] *United States v. Nusraty*, 867 F.2d 759, 763 (2d Cir. 1989).

"purposeful behavior" showing "a deliberate, knowing, specific intent to join the conspiracy."[115]

Circumstantial evidence offered to prove specific intent must be sufficient to support an inference that the defendant had the specific intent necessary to commit the specific substantive crimes that are the object of the conspiracy.[116]

An examination of the evidence reveals the gaping holes in the government's case. Not one witness testified that Bandrich ever counseled a client to misrepresent the facts in an asylum application or in any other official government document or proceeding. No one testified that Bandrich ever had knowledge of a client who was lying in her attempt to gain asylum. There was no evidence that any client ever told Bandrich that the client was relaying a fake persecution story. There was no evidence that any paralegal or support staff informed Bandrich that any of Bandrich's clients were misrepresenting the facts underlying her or his asylum claim.

All of the key witness witnesses who testified against Bandrich were government cooperators seeking to avoid prison time and deportation. Putting aside the palpable motives to lie and shade the truth that each of the witnesses had,

---

[115] *United States v. Diez*, 736 F.2d 840, 843 (2d Cir. 1984).

[116] *See United States v. Samaria*, 239 F.3d 228, 238 (2d Cir. 2001); *United States v. Friedman*, 300 F.3d 111, 126 (2d Cir. 2002); *United States v. Ceballos*, 340 F.3d 115, 129 (2d Cir. 2003).

the testimony even when examined in a light most favorable to the government failed to establish Bandrich's knowing participation in a criminal conspiracy.

The most "damaging" testimony offered by Victor You against Bandrich was that Bandrich told a client during a preparation session to make sure that the client remained consistent with the client's previous sworn statement. You never testified that Bandrich knew herself that the client was telling a "fake story." You never testified that Bandrich counseled any client to lie or that any client told Bandrich that she or he was lying.

Similarly, Meng Fei Yu never testified about any specific client that Bandrich supposedly helped with a fake story. The most direct testimony offered by Yu against Bandrich was that Yu said, in an unrecorded interaction, that Yu wanted to leave the office because Yu had recently worked on a "bad case" and that she feared the government was investigating. Yu said she wanted to leave and Bandrich also said she wanted to leave. Bandrich never said that she had been working on a "bad case" or that she feared that she would get in trouble with the authorities. Taking the testimony at face value, Bandrich merely expressed a desire to leave the firm, a desire shared by probably a majority of young associates in law firms across the country. Bandrich's recorded comments to Yu reflected Bandrich's concerns over the quality of the work being done on behalf of the firm, not over the perpetuation of fraudulent activity.

Two other cooperating witnesses, Wu and Xue, had interactions with the Bandrich firm, but did not provide any evidence supporting a conviction against Bandrich. Xue, who was trying to work off a criminal case by cooperating with the government, approached the Bandrich firm at the behest of the government and pretended to be a client seeking asylum. None of the multiple recordings made by Xue at the Bandrich firm included Bandrich. Neither Xue nor Wu ever testified that Bandrich fed them a cooked up story or otherwise counseled them to submit a fake asylum application.

The documents seized from the Moslemi and Bandrich firms did not implicate Bandrich. None of the Moslemi documents related to Bandrich whatsoever. The documents containing handwritten notes seized from the Bandrich firm were not tied to any fraudulent application that was ever submitted to the government. There was no evidence as to when the notes were written, what context the notes where written in, or whether the client or family members relayed new information leading to the apparent edits. Not one client testified that any fabrication was added to her or his narrative. There was nothing to indicate that those documents were part of any fraud, much less that Bandrich actually wrote on the documents with intent to commit immigration fraud.

What the evidence indicated was that, like most law firms, there were documents that underwent revisions. It was simply pure conjecture that the edits

found on these documents were misrepresentations that were intended to be filed with the government by Bandrich.

A conviction may not be based upon "speculation and surmise."[117] "It is not enough that the inferences in the government's favor are permissible" where circumstantial evidence is offered to prove an element of an offense.[118] Instead, the inferences must be "sufficiently supported to permit a rational juror to find that the element, like all elements, is established beyond a reasonable doubt."[119] Evidence is insufficient to support a conviction if it is "at least as consistent with innocence as with guilt."[120]

The government's own main cooperating witness, Victory You, testified that he believed that Bandrich was used to set up the Bandrich firm. In addition, neither You nor Yu ever testified that Bandrich ever said that she started the firm in order to effectuate any type of fraud.[121]

At trial, the government repeatedly argued that the fraud committed at the firms was so pervasive that Bandrich must have been a part of it. This speculative, guilt by association argument was directly refuted by the recorded conversations

---

[117] *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994).

[118] *United States. v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995).

[119] *Id.* at 1043.

[120] *United States v. Mulheren*, 938 F.2d 364, 372 (2d Cir. 1991); *see United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002).

[121] A 995.

Yu made of Bandrich over the series of lunch dates. Throughout the recordings, [122]

Ms. Yu repeatedly steered the conversation to topics that would have led Bandrich

to make incriminatory statements, if Bandrich had been involved in the conspiracy.

Far from showing Bandrich's criminal involvement, the recordings demonstrated

Bandrich's innocence. Bandrich came across as warm, chatty, and unguarded and

said nothing incriminating. The recordings also showed that Bandrich had a

passion for representing and helping her clients and that she liked winning, all

admirable traits for an advocate.

In sum, the government's case against Bandrich relied upon Bandrich's

association with others and her presence at the firms, not her knowing participation

in a criminal conspiracy. Accordingly, the Court should vacate the jury's verdict

and enter an order of acquittal.

## POINT II

### THE DISTRICT COURT ERRED BY REFUSING TO DISCHARGE JUROR 6 FOR HAVING INAPPROPRIATE INTERACTIONS WITH ANOTHER JUROR

The District Court clearly abused its discretion by failing to dismiss Juror 6

for premature deliberations with a juror who both parties and the Court agreed had

committed juror misconduct by disobeying the Court's instructions regarding the

---

[122] When confronted on cross-examination, Yu admitted that the government's transcription of various passages of Bandrich's recorded statements were incorrect. A 1776-1778; 1782-1783; 1789; 1795; 1791; 1797; 1866; 1868; 1875; 1879; 1886; 1910; 1921.

use of social media and making comments that "could potentially show bias."[123]

Moreover, the Court's ruling to keep Juror 6 over defense objection and with the

consent of at least one of the government prosecutors is especially disturbing

considering that Juror 6 continually disregarded the Court's oft-repeated

instruction to bring to its attention any person "who tried to talk about the case."[124]

Similarly, the District Court abused its discretion in the context of Appellant

Yang's post trial discovery that Juror 2 had also disregarded the Court's instruction

on the use of twitter and whose tweets also reflected a "potential bias" and inability

to "keep an open mind."[125]  A new trial should have been granted.

## A.    The Standard of Review

The Court must "review a trial judge's handling of juror misconduct for

abuse of discretion."[126]

## B.    The District Court Improperly Permitted Juror 6 to Remain on The Case After it Learned of Premature and Inappropriate Deliberations Which the Juror Failed to Report to the Court as Required

The Second Circuit does not require trial judges to instruct jurors at the start

of trial not to discuss the case among themselves.  However, once such an

---

[123] A 2126.

[124] A 452.

[125] A 2126, 453.

[126] *United States v. Abrams*, 137 F.3d 704, 708 (2d Cir. 1998); *see also United States v. Diaz*, 176 F.3d 52, 78 (2d Cir. 1999).

instruction is given, premature deliberations may constitute juror misconduct.[127]  In the case at bar, the District Court concluded that Juror 10 must be removed after an anonymous email was received by the parties regarding the juror's improper tweeting in violation of the District Court's continuous admonitions.

The District Court granted the application to dismiss Juror 10 made on the consent of both parties based on two factors.  First, a clear violation of the District Court's instruction that jurors were not to "tweet about your experience here on Twitter."[128]  Second, the District Court was correctly concerned that Juror 10's tweet that "[b]ut for my ADD, I want to be an ADA" demonstrated a potential bias in favor of the government prosecutors.[129]  During subsequent questioning of Juror 6, whom Juror 10 had tweeted was her "new BFF," it was revealed that she had been riding the train home with Juror 10 every day during the three-week trial and the two jurors engaged in inappropriate conversations about the case.[130]

The inquiry reveals that Juror 10 engaged Juror 6 on numerous occasions. During the questioning by the District Court, Juror 6's answers are evasive,

---

[127] *Abrams* at 708; *see United States v. Cox*, 324 F.3d 77, 86 (2d Cir. 2003); *see also United States v. Carmona*, 858 F.2d 66, 69 (2d Cir. 1988).

[128] A 452.

[129] A 2472.

[130] A 2485-2501.  Juror's Six' statements are a complete contradiction to Juror 10 who completely downplayed her relationship with Juror 6 stating that "I don't even know how to pronounce her last name" and unequivocally stating that they had not spoken about the "substance of the case" when she responded "[a]bsolutely not" to the Court's question regarding inappropriate conversations.  A 2476.

contradictory, ambiguous and at times disturbing. She stated that "[t]here has been a couple attempts" to talk about the case. She later stated that Juror 10 spoke to her about whether "everyone [the jurors] is going to agree with the same situation." The juror then concedes that the conversation got "too close to a gray area" but cannot recall specifics. Nevertheless, she characterizes Juror's 10 conversations as "[t]here is nothing that been over the top." Juror 6 then recalls Juror 10 stating "do you think everybody is one sided. Everybody is automatically going to be – has their mind made up? That kind of thing." Juror 6 denies responding to Juror's 10 inappropriate inquiries and states that "[i]t was more of like an open-ended change the subject kind of a thing."[131]

At this point defense counsel made an application to have Juror 6 removed but the Court deemed the inquiry insufficient and additional questioning took place. The answers provided more disturbing answers from Juror 6.

> THE COURT: OK. Let me ask one more questions. So when we talked earlier about – I think you said something about, you know, you wouldn't answer when you felt like something was over the top. What does over the top mean? What did you mean by that?
>
> JUROR: Ok, maybe not over the top, maybe in a fine gray area from my perspective. And it wouldn't just be Juror 10. You know, there are times where we are all having a good conversation, and something will get thrown out, and the room

---

[131] A 2485-2490.

gets silent because it will just be disregarded like nobody will answer it.[132]

The clear implication is that there were inappropriate conversations made to the entire jury panel. A further disturbing exchange with the Court followed:

> THE COURT: Ok. And so when you were saying views in your head, where were you thinking?
>
> JUROR: I think the general assumption is when you are sitting in a room with these people every day you can pick up distinct observations from them of whether you think they side this way or that way just in general. If I come into this room and look at you guys, you can make an assumption as far as that goes. And I think what I was grasping from her comment was, you know, is that she could peg the views, or she already knew – truth be told, you can't judge somebody from the outside, so I really don't know what these people are thinking; I actually doesn't know what I'm thinking.[133]

After dozens of questions from the Court and an inability to provide detailed answers without constant probing by the Court, Juror 6 minimized her interaction with Juror 10 by stating that her train rides were of short durations, "15 minutes," and they really only spoke about "workout, fitness, kids."[134]

It is uncontroverted that Juror 10 had lengthy and frequent inappropriate conversations with Juror 6. Moreover, Juror 10's flat denial that any such conversations took place can only lead to the conclusion that they engaged in inappropriate and premature deliberations. By Juror 6's own admissions, she was

---

[132] A 2498-2499.
[133] A 2150.
[134] A 2501.

bothered by the content of Juror 10's comments.   In sum, the District Court clearly

erred by refusing to dismiss Juror 6 on that ground alone.

Juror 6, however, also violated the Court's instructions by not reporting this

inappropriate conduct to the Court.  Day after day, she engaged in improper

discourse with Juror 10 and never once brought "it to the attention of Ms. Cavale,

my courtroom deputy, and she'll bring it to my attention."[135]  There can be no

interpretation of these facts which does not lead to the unequivocal conclusion that

Juror 6's integrity as a juror was compromised.  While it may not have been

through any fault of her own, the damage caused by her repeated conversations

with Juror 10 caused irreparable harm to Bandrich's 6th Amendment rights and the

District Court abused its discretion by refusing to discharge her from the case.[136]

In *Remmer*, the Supreme Court stated that "any private communication,

contact, or tampering, directly or indirectly, with a juror during a trial about the

matter pending before the jury is, for obvious reasons, deemed presumptively

prejudicial."[137]  It is undisputed that Juror 10 had engaged in juror misconduct and

was dismissed as a result.  As such, it defies logic to conclude that the misconduct

of Juror 10 did not spillover to her fellow juror and "new BFF" with whom she

traveled home every day during the course of a three-week trial.  Juror 6

---

[135] A 452.
[136] *See Remmer v. United States*, 347 U.S. 227 (1954).
[137] *Id.* at 229.

50

acknowledged the inappropriate nature of the conversations and, equally as important, failed to report them to the Court. In sum, her ability to sit as a fair and impartial juror had been compromised and she should have been dismissed by the Court.

## POINT III

**THE DISTRICT COURT ERRED IN FAILING TO GRANT RULE 33 RELIEF BASED UPON THE IMPROPER CONDUCT OF JUROR 2**

### A.    The Standard of Review

A motion for a new trial pursuant to Fed. R. Crim. P. 33 is committed to the discretion of the District Court and is reviewed for an abuse of discretion.[138]  The factual findings of the District Court in denying the Rule 33 motions are reviewed for clear error.[139]

### B.    A New Trial Should Have Been Granted by the District Court Based Upon the Failure of Juror 2 to Follow the Court's Instructions and the Bias Reflected in her Tweets

It is misconduct for a juror to fail to obey court orders directing her not to discuss the case.[140]  It is clear from the record that Juror Number 2 repeatedly

---

[138] *United States v. Wong*, 78 F.3d73, 78 (2d Cir. 1996).

[139] *United States v. Imran*, 964 F.2d, 1313, 1318 (2d Cir. 1992).

[140] *See United States v. Juror No. One*, 866 F.Supp.2d 442, 448 (E.D. Pa 2011) ("In this case, Juror Number One's misconduct is based on her failure to obey two separate court orders directing her not to discuss the case with anyone else until the case was complete.").

tweeted about this case despite the District Court's admonishments.  On over twenty occasions Juror Number 2 violated the Court's directive.[141]

Three days into the trial testimony and two weeks before the completion of the evidence in this case, Juror 2 was exhibiting a bias against Ms. Yang and the other defendants as evidenced by her tweets on March 26, 2014, where she discusses inviting the "**judges, prosecutors & witnesses**" to speak to her "chapter."  This prejudice is restated ten days later when she states that "**[a]nd I am still trying to figure out how to ask the FBI guys, judge, and AUSAs if any of them will talk to my…**"  On both occasions, noticeably absent from her tweets are the defendants or defense counsel.

Moreover, Juror Number 2's tweets reveal a person who seems more focused on obtaining information for a future book rather than someone attentive on the matter at hand.   On March 27, 2014, in response to an inquiry from a fellow tweeter about whether Juror Number 2 is "getting any book ideas while there?" the juror responds **"Oh Plenty."**  On April 6, 2014, when Juror Number 2 is asked **"[b]ut you've got a lot of good research and plot bunnies, right?"** she responds **"Oh, tons. And I am still trying to figure out how to ask the FBI guys, judge, and AUSAs if any of them will talk to my…"[142]**  It is simply not plausible to conclude that a juror who was so infatuated with getting the government to speak

---

[141] A 2840-2842, 2849-2863.
[142] A 2840-2842, 2849-2863.

52

to her writing club would enter into jury deliberation with an open and impartial mindset.  Juror Number 2's tweets reflect that her integrity as a juror had been compromised in an effort to attain a personal gain from her jury service.

In the instant matter, the District Court, from the onset of the trial, directed the jurors specifically not to tweet about their experiences on Twitter – "Don't Tweet about your experience here on Twitter"[143]  A similar cautionary instruction was given on at least twenty-nine different occasions.[144]  At the end of every trial day, the Court directed jurors "not to discuss the case and keep an open mind."  Despite the Court's directives, however, Juror 2, just like disqualified Juror 10, disregarded these crucial instructions.

The clear bias in favor of the government exhibited by two of the tweets denied Bandrich her 6th Amendment Constitutional Rights which can only be cured by a new trial.  In sum, Juror 2's disregard of the District Court's Orders to not "tweet" about her jury service and the underlying bias exhibited in the tweets represents misconduct.[145]  In light of Juror 2's behavior, the District Court abused its discretion in denying a new trial.

**C.    Juror 2's Misstatements During the April 9, 2014 Questioning by the District Court Required That a New Trial be Ordered Pursuant To Fed. R. Crim. P. 33**

---

[143] A 446.

[144] SPA 55.

[145] *See Supra Juror Number One*.

The Supreme Court has promulgated a two-part test before a defendant can be entitled to a new trial based on juror misstatements during v*oir dire*. First, a defendant must show that the juror failed to answer honestly a material question on v*oir dire*. Second, the defendant must show that an accurate response would have provided a basis for a "Cause" challenge.[146] It is clear that Juror 2 was tweeting about the trial since its inception and thus was untruthful during the District Court's April 9, 2014, *in camera* questioning of her. The dates of her tweets overlap with the time frame in which she was a sitting juror in Ms. Yang's trial. The trial commenced on March 19, 2014, and concluded on April 14, 2014. The tweets begin on March 23, 2014, and continue well after the verdict date. Despite the prolific tweeting that Juror 2 engaged in prior to the April 9, 2014, she repeatedly denied during questioning that she had communicated about this case on the internet or social media.

> THE COURT: Have you spoken or communicated about this case is any way with any of the other jurors?
>
> JUROR: No.
>
> THE COURT: Either in person or on social media?
>
> JUROR: No.
>
> THE COURT: Have you followed this at all on the Internet or on social media?

---

[146] *McDonough Pwr. Equip. v. Greenwood*, 464 U.S. 548, 556 (1984); *United States v. Shaoul*, 41 F.3d 811, 815 (2d Cir. 1990).

JUROR: No.[147]

In fact, Juror 2 not only followed the case on social media, she was one of its authors.

As the Court recently stated in *United States v. Parse*,[148] a juror who lies during *voir dire* indicates an impermissible partiality which denies the defendant of the right to be tried before an impartial jury. Thus, the only real issue for the Court to determine if a new trial was warranted under *McDonough v. Greenwood* was whether Juror 2's behavior would have led to a *For Cause* challenge. The answer is clear given the record of what transpired with Juror 10; in that matter, all parties agreed that she should be removed from the jury based on her tweeting. In concurring to dismiss Juror 10, the District Court stated "… I do think it was improper [Juror 10's tweeting]. I think we all agree it was the proper course to excuse her."[149] Nevertheless, the District Court inexplicably sought to apply a different standard when dealing with the impropriety of Juror 2. The tweets by Juror 2 on twitter were of a similar nature to the tweets of the disqualified juror in terms of substance, style and bias although clearly greater in number. As such, no credible argument could be put forth to suggest that had the parties become aware

---

[147] A 2480-2481.
[148] 2015 WL 3540434 (2d Cir. June 8, 2015).
[149] A 2477.

of Juror Number 2's tweets during the April 9, 2014 *voir dire* that she would have

not been removed *For Cause*.

In *Parse*, as in the case at bar, Juror 2 "aligned herself with the

government."[150] Juror Number 2's tweets, which belie an affinity for the

Government Agents, the Government Prosecutors, and the Government Witnesses

would have been cause for dismissal had they been discovered during the trial.

### D. The District Court Erred in Not Granting a Factual Hearing to Inquire of Juror 2 Regarding her Misconduct

One of the principal factors in *Parse* was that the juror lied to make herself

more attractive to the Court so she could stay on the jury. This information only

became clear because a post-trial hearing was ordered.[151] When new information

comes to light after a trial, a post-trial evidentiary hearing is appropriate where

reasonable grounds for investigation exist.[152]

Juror Number 2 tweeted on two separate occasions about her interest in

securing an out-of-court appearance by FBI agents, Government prosecutors, and

the Judge for her book club. Juror Number 2 tweeted prolifically during the course

of the trial. Juror Number 2 failed to provide a forthright answer to *in camera*

questioning about her contact with other jurors and her social media participation.

---

[150] *Parse*, at *36.
[151] *Id.*
[152] *See United States v. Ianello*, 866 F.2d 540 (2d Cir. 1989); *United States v. Moten*, 582 F.2d 654 (2d Cir. 1978).

At a minimum the District Court should have granted the alternative relief sought in the Rule 33 motion and conduct a factual hearing into Juror 2's misdeeds. In sum, if the Court refuses to grant a new trial, we request that the matter be remanded to the District Court to conduct a factual hearing.

## <u>CONCLUSION</u>

WHERFORE, for all the foregoing reasons, the judgment of conviction should be reversed and vacated or, in the alternative, a new trial ordered, or the case should be remanded to the District Court for a factual hearing on the issue of Juror 2's misconduct.

Dated:      New York, New York
           July 1, 2015

                         Respectfully submitted,

                         /S/

                         SEAN M. MAHER
                         The Law Offices of Sean M. Maher, PLLC
                         233 Broadway, Suite 801
                         New York, NY 10279
                         (212) 661-5333
                         Attorney for Appellant

57

## **CERTIFICATION**

This brief is in compliance with this Court's length requirements as it

contains 11,851 words, inclusive of footnotes as measured by the Word Count

function of Microsoft Word.  It is typed in 14 point, Times New Roman format.


_____/S/_____
SEAN M. MAHER